IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GE PACKAGED POWER, INC.
and GENERAL ELECTRIC
INTERNATIONAL, INC.,

                    Plaintiffs,

v.                                                    1:05-cv-1517-WSD

READINESS MANAGEMENT
SUPPORT, L.C.,

                    Defendant.

## OPINION AND ORDER

This matter is before the Court on Plaintiffs' Motion for Summary Judgment
[45] and supporting briefs, Defendant's Opposition to Plaintiffs' Motion for
Summary Judgment [72], Defendant's Statement of Material Facts [71],
Defendant's Response to Plaintiff's Statement of Material Facts [70], and
Plaintiffs' Reply Brief in Support of Their Motion for Summary Judgment [82].

## I.      BACKGROUND

        A.      Facts

Plaintiffs GE Packaged Power, Inc. and General Electric International
(collectively "Plaintiffs" or "GE") and Defendant Readiness Management Support,

L.C. ("Defendant" or "RMS") entered into a contract on November 30, 2003 (the "GE contract") in which GE agreed to supply two generators, each including a "refurbished RR Avon Model 1533 gas generator and GEC EAS1 Power Turbine" with specified continuous duty, peak duty, and heat rate parameters (the "generators").[1]  RMS intended to resell the generators to the United States Agency for International Development ("USAID") for use in Operation Enduring Freedom, the United States' reconstruction effort in Iraq.  RMS had a separate resale contract for the generators with USAID.

The generators were located in Greece, where they were to some degree examined by RMS engineers on October 31, 2003.[2]  RMS then authorized GE to release the generators to it, and shipped them to Iraq in December of 2003.

When the generators arrived in Iraq, the parties do not dispute that they were inspected fully by RMS.  USAID personnel also inspected the generators.  On at

---

[1]  GE asserts that RMS actually knew that AP1 power turbines would be provided.  RMS disputes this parole evidence, relying on the text of the contract and the GE proposal documents.  The contract itself specifies "EAS1" power turbines on multiple occasions.

[2]  The parties dispute the degree to which the generators were actually inspected in Greece.  GE contends that they were inspected thoroughly, and that log books and manuals were available.  RMS contends that the generators were in pieces, and some of the pieces and the log books and manuals were unavailable.

least December 18, 2003, December 31, 2003, January 1, 2004, and January 21, 2004, an RMS project manager in Iraq informed GE via email that USAID had deemed the generators unacceptable.[3]

Upon arrival of the generators in Iraq, RMS discovered that they did not contain EAS1 power turbines, as specified in the contract, but rather contained AP1 power turbines. GE contends that the difference between the two types of power turbine is not material, that RMS agreed to AP1 power turbines, and that the failure of the contract to specify AP1 power turbines was a scrivener's error. RMS contends, and has identified evidence in the record, that it contracted for EAS1 power turbines, that it did not agree to accept AP1 power turbines as substitutes, and that the contract forbids substitutions without the buyer's authorization.

The condition of the generators after their arrival in Iraq is also a matter of dispute. GE contends that the generators were properly refurbished, met the contract specifications, and had 3,000-5,000 hours of operational time. RMS contends that the generators were not refurbished, were rusted through in places, had wires so old that the insulative covers were brittle, and contained parts covered

---

[3] The parties dispute why the USAID found the generators unacceptable. GE asserts that the USAID expected new equipment. RMS contends that the USAID found that the generators were not "refurbished," but rather were "used."

with tape that crumbled when touched.  RMS does not dispute, however, that on December 24, 2003, its project manager wrote that he thought the generators were technically sound.

The parties also dispute the nature of the communications between RMS and GE after the generators arrived in Iraq.  Although RMS did not claim that GE had defaulted on the contract after the generators arrived in Iraq, it communicated a series of complaints and objections concerning the generators to GE beginning in December 2003.  For example, on December 17, 2003, RMS emailed GE "[w]e're going to have to have a plan for getting these things into acceptable shape."  On December 18, 2003, RMS emailed GE that "[v]isible leaks and rust have been present for a significant period of time," and that the generators' general condition was "old, deteriorated, and clearly not refurbished."  On December 21, 2003, RMS emailed GE that the USAID thought the generators were "junk," and that the USAID did not intend to accept them.  On December 31, 2003, RMS emailed GE that USAID deemed the generators unacceptable.  RMS reiterated this communication on January 1, 2004.

On January 6, 2004, RMS emailed GE that "it is not at all clear that the units have been refurbished," and inquired whether GE had "any success with locating

acceptable replacement units?"  That same day, GE emailed RMS that a meeting in Baghdad later that week would "address . . . issues that are preventing acceptance of the packages."  On January 9, 2004, RMS again inquired by email if acceptable replacement units had been found.  On January 22, 2004, RMS reiterated its concern that the generators were "used," not "refurbished."  In an internal email of January 26, 2004, the record shows that a GE employee considered whether an alternative buyer for the generators might be found.

Despite the communications above, the parties do not dispute that in December, 2003 and January, 2004, RMS and GE attempted to cooperate towards persuading USAID to accept the generators.  GE communicated directly with USAID, and explained that the operational time on the generators should not be a concern because two of the four major components of the generators regularly run 100,000 hours between overhauls.  GE offered to extend the warranty on the generators from 12 to 18 months.  The parties agree this offer was reasonable, and that it should have–but did not–alleviate USAID's concerns.  USAID formally rejected the generators on January 21, 2004.  The parties agree that USAID had decided not to accept the generators by the time RMS sought GE's assistance to persuade USAID to accept the equipment.

After the generators were rejected by USAID, in April, 2004, GE and RMS entered into a remarketing agreement for the generators.  GE, for at least one potential purchaser, introduced the buyer and prepared an offer on RMS's behalf, on RMS's letterhead, for RMS's signature.  RMS made the pricing decisions for this offer, and specified that all sale proceeds would accrue directly to RMS.  The sale was not consummated.

On July 31, 2004, RMS sent GE a letter informing it that RMS "has formally rejected" the generators "[b]ecause USAID rejected the equipment."  The parties dispute whether this letter was the first notice of rejection.  GE contends that it was, while RMS contends that the email communications of December 2003 and January 2004 were sufficient to constitute notice of rejection.

During the summer of 2004, RMS moved the generators to leased storage space in the Taji military base northeast of Baghdad.  RMS has not returned them to GE.  In 2005, RMS attempted to sell the generators to the U.S. Army and the British Navy, but was unable to consummate either sale.  RMS handled these negotiations without input or assistance from GE.

B.     The Contract

The Contract calls for GE to provide "Refurbished Gas Turbine Generating Set Configurations."  The Contract specifies that the generator's power turbine is to be a "Refurbished RR Avon Model 1533 gas generator and GEC EAS1 Power Turbine . . . rated at 12MW ISO for continuous duty and 9MW at 50 degrees C for base load rating.  Peaking is at 14MW at ISO and 11MW at 50 degrees C.  The corresponding heat rate is 12,500 BTU/KwHr."

Section 5.B of the Contract obligates GE to provide for the "[r]emoval of damaged [power turbine] and installation of refurbished EAS1. . . ."  The Bill of Materials attached to the contract provides for a charge of $1,020,000.00 per generator for "exchange" for an "EAS1 power turbine," and $268,500.00 for "training" related to "exchange of EAS1 power turbine."  The total amount due, according to the Bill of Materials, was $8,886,600.00.

Section 11 of the contract provides that "All equipment supplied as a part of this [contract] is subject to final inspection and acceptance by USAID/OFDA prior to shipment.  Seller to notify Jim Jackson . . . no later than 5 days prior to the availability for inspection to arrange for coordination of final inspection at seller's facility."

In an addendum titled "General Conditions," section GC-7 reads:

> Seller shall ensure that the Products comply with the standards of quality customary in the industry for used and/or re-furbished third party equipment Buyer's right to inspect, examine, and test the Products shall extend through the time of shipment and a reasonable time after arrival at the final destination.  The Products shall not be deemed accepted until finally inspected and accepted by Buyer's representative at final destination. The making or failure to make an inspection, examination or test of, or payment for, or acceptance of the Products shall in no way relieve the Seller from its obligation to conform to all of the requirements of this Agreement and shall in no way impair Buyer's right to reject or revoke acceptance of nonconforming Products, or to avail itself of any other remedies to which Buyer may be entitled, notwithstanding Buyer's knowledge of the nonconformity, its substantiality, or the ease of its discovery. [need to delete or spell out acceptance process].

(Contract, GC-7) (brackets and bracketed material in original).

GC-15, title "Non-Waiver," reads:

> Failure by either party to insist upon strict performance of any of the terms and conditions hereof, or failure or delay in exercising any rights . . . or to properly notify the other party in the event of breach, or the acceptance of or payment for any Products hereunder, or review of design, shall not release the other party from any of the warranties or obligations of this Agreement and shall not be deemed a waiver of any right of a party to insist upon strict performance hereof or a waiver of any of its rights

> or remedies as to any such Products regardless when
> shipped, received or accepted, or as to any prior or
> subsequent default hereunder . . . .

GC-17 provides that "the definition of terms used, interpretation of this

Agreement, and rights of the parties" are to be interpreted under the laws of New

York, and specifies the Northern District of Georgia as the forum for dispute

resolution.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party

seeking summary judgment bears the burden of demonstrating the absence of a

genuine dispute as to any material fact.   Herzog v. Castle Rock Entertainment, 193

F.3d 1241, 1246 (11th Cir. 1999).  One scenario in which there is no dispute of

material fact is if "a party . . . fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986).  Once the moving party has met this burden, the non-movant must

demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must resolve all reasonable doubts in the non-movant's favor.  United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am., 894 F.2d 1555, 1558 (11th Cir. 1990).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III.   DISCUSSION

GE advances two arguments on summary judgment.  GE first argues that RMS accepted the generators by failing to reject them effectively.  Second, GE argues that even if RMS effectively rejected the generators, the rejection was wrongful or in bad faith.

The contract states and the parties agree that New York law governs interpretation and definition of contractual terms at issue in this case.  Specifically, the parties agree that the contract is subject to the New York Uniform Commercial Code ("N.Y.U.C.C.").

### A.   Acceptance, Rejection, and Revocation of the Goods

Under the N.Y.U.C.C., rejections of goods "require affirmative action by the buyer to avoid acceptance."  N.Y.U.C.C. § 2-602(1), cmt. (2001).  To be effective, acts of rejection "must be within a reasonable time after their delivery or tender."  Id. § 2-602(1).  The amount of time that is "reasonable" for inspection and seasonable notification of rejection "depends upon the nature, purpose, and circumstances of the acts."  Sherkate Sahamo Khass Rapol v. Henry R. Jahn & Son, Inc., 701 F.2d 1049, 1051 (2d. Cir. 1983).  Ordinarily, whether a notice of rejection is "seasonable" will "generally . . .  present questions of fact for the jury,"

11

although it may, under exceptional circumstances, be determined as a matter of law.  Weil v. Murray, 161 F.Supp.2d 250, 256 (S.D.N.Y. 2001).  See also Sherkate, 701 F.2d at 1049; Texpor Traders, Inc. v. Trust Co. Bank, 720 F.Supp. 1100, 1110 n.8 (S.D.N.Y. 1989).  For example, in Weil, the court held that a "reasonable time" had passed as a matter of law when: i) it was undisputed that the buyer had in fact inspected the goods at least twice; ii) the buyer retained possession of the goods; and iii) there was no evidence that the buyer found the goods unsatisfactory or non-conforming.  Id. at 256.

Under the N.Y.U.C.C., "notice" occurs "by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it." N.Y.U.C.C. § 1-201(26).  A party receives notice when these steps "come[] to his attention."  Id. § 1-201(26)(a).  A "mere complaint about the goods," however, "does not constitute a clear and unequivocal act of rejection." Sears, Roebuck & Co. v. Galloway, 195 A.D.2d 825, 826 (N.Y. App. Div. 1993) (quotations omitted).  Such complaints, even when they are directed towards goods' suitability, do not necessarily constitute a rejection, and may constitute a request for a cure.  See Hooper Handling, Inc. v. Jonmark Corp., 267 A.D.2d. 1075 (N.Y. App. Div. 1999) (holding that buyer's complaints about

the stability and weight-bearing capacity of shelving and a mezzanine was not a rejection, but a mere request for a cure).  When a buyer's complaints amount to a notification of continuing problems that the goods are nonconforming, however, it may be reasonable to infer that those complaints do constitute notice of rejection. See D.C. Leathers, Inc. v. Gelmart Indus., Inc., 125 A.D.2d 738, 740 (N.Y. App. Div. 1986) (holding that it was "reasonable to infer" that a series of letters complaining that one-third of goods were defective constituted notice of rejection).

Acceptance of goods occurs:

> (a) after a reasonable opportunity to inspect the goods [the buyer] signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or
> (b) [the buyer] fails to make an effective rejection, but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
> (c) [the buyer] does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

N.Y.U.C.C. § 2-606(1).  See also Miron v. Yonkers Raceway, Inc., 400 F.2d 112 (2d Cir. 1968).

Acts "inconsistent with the seller's ownership" include retaining and using the goods for a long period of time, or resale of the goods.   See Sears, 195 A.D.2d at 826 (holding that possession and use of a boiler through "several heating

seasons" was inconsistent with the seller's ownership).   See also Gem Source

Int'l. v. Gem Works, N.S., L.L.C., 258 A.D.2d 373 (N.Y. App. Div. 1999) ("The

act of resale extinguished any objection defendant might have had to its receipt of

the diamonds based upon inferior quality.").  Once goods are accepted, the buyer

"must pay the contract rate . . ."  N.Y.U.C.C. § 2-607(1).

Revocation of acceptance "must occur within a reasonable time after the

buyer discovered or should have discovered the ground for it and before any

substantial change in the condition of the goods which is not caused by their own

defects. [Revocation] is not effective until the buyer notifies the seller of it."   Id.

§ 2-608(2).  A buyer who properly revokes acceptance "has the same rights and

duties with regard to the goods as if he had rejected them."   Id. § 2-608(3).

When acceptance is "made with knowledge of non-conformity," it cannot be

revoked because of such non-conformity "unless the acceptance was on the

reasonable assumption that the non-conformity would be seasonably cured . . ."

Id. § 2-607(2); see also id. § 2-608(1)(a).  Notice of a revocation may, however, be

"based on the reasonable assumption that the nonconformity would be cured but

was not."  Hooper Handling, 267 A.D.2d. at 1075.  That is, the buyer may revoke

an acceptance of goods when it communicates complaints concerning the goods,

14

coupled with instructions to the seller to replace or retrieve them.   See id. (reversing grant of summary judgment where "once [buyer] received the engineering firm's report, it notified [seller] of the nonconformity and instructed [seller] to pick up the [goods]").

GE advances two arguments that RMS accepted the generators:  (i) RMS accepted the generators by failing to make an effective rejection; or (ii) RMS accepted the generators by acting inconsistently with GE's ownership.  For the reasons set forth below, both arguments fail.

### 1.      *RMS's Rejection or Revocation*

RMS has raised a genuine issue of fact regarding whether it rejected the generators.  It is undisputed that RMS had rejected the generators by July 31, 2004. Whether that rejection is "seasonable" is, in the absence of exceptional circumstances, an issue of fact for the jury.  Under New York law, the circumstances under which a Court may find notice of rejection unseasonable as a matter of law are indeed exceptional, such as when there is no issue of fact that (i) the buyer actually inspected the goods twice; (ii) the buyer retained possession of the goods; and (iii) there was no evidence in the record that the buyer found the goods unsatisfactory or nonconforming.   See Weil, 161 F. Supp.2d at 256.

Such exceptional circumstances do not exist in this case.  RMS has identified specific facts in the record showing that it communicated to GE that the generators were unsatisfactory or otherwise nonconforming almost immediately after the generators arrived in Iraq.  RMS has identified numerous communications in which it notified GE that the generators were "not acceptable" or "junk," as well as its basis for these complaints.  That RMS was often relaying or repeating complaints of the USAID is not relevant; what is relevant is that the facts are not indisputably clear that the rejection was unseasonable.  That RMS expressed frequent and serious dissatisfaction with the generators is sufficient to preclude this Court from ruling as a matter of law on this fact-specific issue.

Even if RMS's July 31, 2004 "formal" rejection was unseasonable, it would still be inappropriate to rule as a matter of law that RMS accepted the generators.  RMS has raised a genuine issue of fact regarding whether its "formal" rejection of the generators was its first effective rejection, or merely a reiteration of prior communications that, taken in whole or in part, constituted an effective rejection.  RMS has identified specific record evidence to show that it expressed repeated, specific objections about the conformity and suitability of the generators in December, 2003, and January, 2004.  Whether the December and January emails to

16

GE are sufficient to constitute an effective rejection of the goods, and whether these emails were actually recognized as a rejection by GE, are issues of fact. Indeed, the record suggests that GE knew that RMS did not accept the generators, because in January it considered attempting to place the generators with a different buyer.  This evidence corroborates RMS's claim that GE considered the units rejected.

Even assuming that RMS accepted the generators, genuine issues of fact exist regarding whether RMS revoked that acceptance.  The contract states, "[t]he making or failure to make an inspection, examination . . . or acceptance of the Products shall in no way relieve the Seller from its obligation to conform to all of the requirements of this Agreement and shall in no way impair Buyer's right to reject or revoke acceptance of nonconforming Products . . ."  (Contract, GC-17.) The contract thus grants RMS the right to revoke non-conforming goods, regardless of whether it seasonably discovered the non-conformity.  Under New York law, notice of revocation may also be "based on the reasonable assumption that the nonconformity would be cured but was not."  Hooper Handling, 267 A.D.2d. at 1075.  The record shows that RMS may have been acting under the assumption that GE would cure the noncomformities about which it complained in

its December, 2003, and January, 2004 emails.  The record shows that RMS communicated to GE repeated complaints of nonconformity, along with demands for a cure that were not met.  Whether RMS's complaints and requests for cure constituted a revocation of acceptance when those requests for cure were not met constitutes an issue of fact.  Summary judgment on this issue is inappropriate.

### 2.   *RMS's Disposition of the Generators*

GE next argues that RMS accepted the generators by acting inconsistently with GE's ownership of them.  The N.Y.U.C.C. allows buyers to resell nonconforming goods to cover damages absent contrary instructions from the seller.  N.Y.U.C.C. § 2-604.  The buyer does not thereby accept or convert the goods.  See id. § 2-603(3) ( "the buyer is held only to good faith and good faith conduct hereunder is neither acceptance nor conversion . . .").  See also § 2-604 (storing rejected goods or reselling them for the seller's account "is not acceptance or conversion.").  The parties do not dispute that RMS would have had the right to retain and resell the generators after effectively rejecting them.

GE claims that RMS accepted the generators by holding itself out as the owner in several attempts to resell them.  GE argues that because RMS never "effectively" rejected the generators, its later resale efforts constituted acceptance.

Because issues of fact exist regarding whether RMS effectively rejected the generators, the Court cannot hold as a matter of law that RMS acted inconsistently with GE's ownership of the generators.  GE argues that RMS never gave notice of its intention to sell the generators.  The Court notes that this argument was raised in reply, and RMS has not had a chance to respond.  The record shows, however, that GE likely had notice that RMS (i) was not inclined to pay the remainder of the purchase price for the generators; and (ii) that RMS intended to resell the generators on GE's account.  RMS also disputes that it held itself out as the exclusive owners of the generators.  RMS has thus raised a genuine issue of fact regarding whether it acted in good-faith pursuant to its statutory right to sell the generators without accepting them.

 B. <u>Bad-Faith or Wrongful Rejection</u>

A rejection of goods must be made in good faith.  <u>Y&N Furniture, Inc. v. Nwabouku</u>, 190 Misc.2d 402, 404 (N.Y. City Civ. Ct. 2001).  Under New York law, the "perfect tender rule" governs.  Buyers are in good faith entitled to reject goods "for any nonconformity, even one that is trivial."  N.Y.U.C.C. § 2-601 ("if the goods or the tender of delivery fail <u>in any respect</u> to conform to the contract, the buyer may . . . reject the whole . . .") (emphasis added).  <u>See also Y&N</u>

19

Furniture, 190 Misc.2d at 404;  DeJesus v. Cat Auto Tech Corp., 161 Misc.2d. 723

(N.Y. City Civ. Ct. 1994).

To reject goods in bad faith, a buyer must have no good-faith belief that the

goods are conforming.  Y&N Furniture, 161 Misc.2d at 724.  By contrast, goods

are rejected "wrongfully" when the buyer "honestly believe[s] that the goods fail to

conform," but that belief is in error.  Id.

RMS has raised a genuine issue of fact concerning whether the generators

conformed.  GE does not dispute that the generators were nominally non-

conforming.  GE admits that EAS1 power turbines were designated in the contract,

but AP1 power turbines were delivered to RMS.  GE argues that the EAS1

designation was a mere "scrivener's error."  RMS has identified multiple

documents in the record—most compellingly multiple instances in the contract

itself—that call for EAS1 power turbines.  GE has not identified any instance in

the contract referring to AP1 power turbines.  RMS contends, and GE does not

dispute, that contract does not permit GE to substitute even substantially

conforming goods without RMS's permission.

RMS points to evidence in the record that the generators were also

substantially non-conforming.  RMS has raised an issue of fact regarding whether,

instead of being "refurbished" or "like new," the generators were substantially used or could be classified as "junk."

The record further shows that RMS manifested concerns about the conformity of the goods beginning in mid-December, 2003.  The record thus supports that genuine issues of fact exists regarding (i) whether the generators conformed to the contract; and (ii) whether RMS believed the generators to be non-conforming.  Summary judgment on these issues is inappropriate.

## IV.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** the Plaintiffs' Motion for Summary Judgment [45] is **DENIED**.

**SO ORDERED** this 12th day of January, 2007.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE